879 F.2d 864
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Reuben CRAWFORD, Billy Renfro, Plaintiffs-Appellants,
Jesse Clark, Lennon Hayes, Carl Dunn, Danny Murrell, Arthur
J. Rudd, David Wrushen, Joe Smith, Plaintiffs,
v.
NAVISTAR INTERNATIONAL TRANSPORTATION CORP., Defendant-Appellee.
 No. 88-5908.
 United States Court of Appeals, Sixth Circuit.
 July 17, 1989.
 
 Before BOGGS, Circuit Judge, CELEBREZZE, Senior Circuit Judge, and ANN ALDRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Billy Renfro (Renfro) and Reuben Crawford (Crawford) appeal a judgment against them in their race discrimination suit under Title VII. 42 U.S.C. Sec. 2000e, et seq. The action was heard during an eight-day trial held in February 1986. The district judge issued extensive Findings of Fact and Conclusions of Law, finding the plaintiffs' claims to be without merit. Only Renfro and Crawford appeal. Crawford and Renfro, as well as Navistar, adopt the findings of fact set forth by the district court. Crawford and Renfro challenge the district court's determination that Navistar had met its burden of articulating a legitimate, nondiscriminatory business purpose for its decision, and that this purpose was not a pretext for discrimination. We affirm.
 
 
 2
 * A
 
 
 3
 Crawford and Renfro are Black males who formerly were employed by the International Harvester Corporation, now known as Navistar International Corporation (Navistar), as molding foremen in its Memphis Foundry. Both men performed their jobs satisfactorily or better. Their claims in the instant case arise out of the closing of the Foundry at Navistar's Memphis, Tennessee facility in 1980. At the time of the closing, Navistar had no formal, written policy with respect to facility shutdowns.
 
 
 4
 In carrying out the Memphis Foundry closing, Navistar placed certain Foundry management employees in management positions on the "plant side" of its Memphis facility and in positions in its foundries in Louisville, Kentucky and Waukesha, Wisconsin. Other management employees returned to bargaining unit positions in the Memphis Plant. For purposes of this appeal, Crawford and Renfro claim that Navistar intentionally discriminated against them on the basis of race by selecting less qualified white employees to fill management positions at other foundries.
 
 
 5
 In August 1980, Navistar's Memphis facility consisted of two parts: the foundry side and the manufacturing or plant side. On August 6, 1980, Navistar announced the closing of the Memphis Foundry. Navistar immediately commenced procedures for closing the Foundry. That closing was ultimately completed on about October 31, 1981. At the time that the decision to close the Foundry was announced, there were four facilities in the International Harvester system. These were located at Memphis, Louisville, Waukesha and Indianapolis. No management openings existed in Indianapolis, and no Memphis Foundry employees were transferred there.
 
 
 6
 When Navistar began closing the Memphis Foundry, it also began efforts to place Foundry management employees in management positions at the Memphis Plant or at other foundries. The key individuals responsible for working with Foundry management employees were Ron Butschle, Corporate Director of Human Resources for the Components Group of which the Memphis Foundry was a part and later Director of Labor Affairs and Employee Relations; and Ron Poll, Human Resources Manager for the Memphis Foundry. Both Butschle and Poll are white males.
 
 
 7
 After the closing of the Memphis Foundry was announced, Butschle and Poll met at least twice with each foundry management employee, including Crawford and Renfro. At the first meeting, either Butschle or Poll explained a separation pay policy and possible bargaining unit rights, and discussed the employee's interest in any available positions outside of Memphis.
 
 
 8
 After the first meeting with employees, a second meeting was arranged that included Carl Walker, Memphis Foundry Manager; Ralph Anderson, Manager of Manufacturing, Foundry Division; Bill Saltzman, Foundry Manager at Louisville; Howard Wolf, Foundry Manager at Waukesha; Poll and Butschle. All individuals who participated in this meeting are white and were aware, as were other decisionmakers at Louisville and Waukesha, of Navistar's desire to attain affirmative action objectives. At the meeting, qualifications of individual Foundry management employees were reviewed. The review was based on files containing wage and position histories and achievement in career evaluations. Each individual was evaluated for potential to upgrade the management force in Louisville or Waukesha. Butschle urged Wolf and Saltzman to look closely at available Memphis people to upgrade their organizations. Officials at other facilities, not Poll and Butschle, made the final determinations regarding hiring of Memphis Foundry employees seeking transfers to other locations. Poll did have a role in suggesting names of managers who might qualify for particular jobs at other facilities.
 
 
 9
 After this meeting, another meeting was held with each Foundry management employee. At this meeting, those who had not been identified by Louisville or Waukesha were advised of their options, and those identified by other locations were advised of scheduled interviews for those locations. Generally, the options outlined to those employees not identified as possibilities for Louisville and Waukesha included termination, a move to a management position at the Memphis Plant or a return to the bargaining unit in the Memphis Plant. Foundry management employees had not acquired bargaining unit seniority during their period in management. Consequently, in order to return to the bargaining unit, a manager had to have sufficient prior seniority in the bargaining unit.
 
 
 10
 No list of available positions in Waukesha, Louisville or the Memphis Plant was provided to Foundry management employees. Similarly, there were no sign-up sheets for interviews, or lists on which an employee could express interest in a transfer.
 
 
 11
 At the time Navistar was trying to place employees elsewhere in the organization, all Harvester locations were reducing manpower because of business conditions and budget constraints. The Louisville Plant closed in December 1982, and the Louisville Foundry ultimately closed in July 1984. The Memphis Plant began a phase-down in August 1982, reducing the work force from 3,000 employees to 650 as of August 9, 1982, and 200 as of October 1, 1982. The Memphis Plant originally was scheduled to close on February 5, 1983, but finally closed in December 1985.
 
 B
 
 12
 The educational and employment histories of Crawford and Renfro, as well as their treatment by Navistar, must be considered in evaluating their claim of discrimination. Crawford has a high school diploma, completed one year of accounting correspondence courses and one semester at Shelby State Community College. He also has attended numerous seminars and technical training courses offered by Navistar. Crawford was hired by Navistar (then Harvester) on November 29, 1965 as a laborer in the molding and iron pouring department, Department 84. He later worked as a shifter of weights and jackets in Department 84 and molder squeezer in Department 81. As a molder squeezer, Crawford performed three operations in both Departments 81 and 84: molder squeezer, cope and drag, and slinger. Other positions Crawford held include laborer in Department 40 in the Plant, performing the functions of packing and shipping products and handling paperwork, drop hammer operator and bulldozer operator in the forge shop, packer in two different departments, and janitor in Department 57 in the Plant.
 
 
 13
 On November 2, 1970, Crawford entered what is known as the Management Development Trainee Program (MDT program). He received on-the-job training in the two molding departments, Departments 81 and 84, and also trained in several other departments in the Foundry and the Plant.
 
 
 14
 After successful completion of the MDT program, Crawford was assigned to Department 84, the molding department, as foreman in the matchplate molding unit. He served in that position for two days before assuming a foreman's position in the cope and drag molding unit. He remained in the cope and drag position as foreman and lead foreman until 1977, except for a temporary assignment as foreman in the core room, Department 82. On April 25, 1977, Crawford was promoted to general foreman over Department 84. He initially worked on a day shift and later was assigned to the second shift as superintendent.
 
 
 15
 On May 1, 1978, Crawford was demoted to foreman in the mill room. He was informed that this demotion was due to production scheduling and a managerial reduction in the Foundry. He did not receive a decrease in pay with this demotion. After his demotion, Crawford occasionally filled in for absent general foremen.
 
 
 16
 Crawford's personnel evaluations indicated ratings of satisfactory or excellent in all areas. When new hunter automatic molding machines came into Department 80 in 1978 and 1981, Crawford was placed on special assignment as sand control foreman in the melt department.
 
 
 17
 Crawford attended the August 1980 meeting at which he was notified of the closing of the Foundry. He also had a subsequent individual meeting with Poll and Butschle, during which he claims that he was told that there were no jobs available in Memphis or sister plants, and that his options were to go back to the bargaining unit or take a managerial separation. During the next week or ten days, Crawford asked Poll several times if there were openings available at the Memphis Plant or other plants. Poll consistently told Crawford that no jobs were available.
 
 
 18
 Crawford was again demoted on January 5, 1981, to the bargaining unit position of shearer operator in the forge shop. He was laid off effective January 30, 1981. He was recalled on March 19, 1981, as an assembler, and was finally laid off permanently on May 1, 1981.
 
 
 19
 Billy Joe Renfro has an Associate of Science degree from Owen Junior College and has received training in management from Memphis State University and Shelby State Community College. Renfro served in the military and attained the rank of sergeant and specialist. As an E-5 in Viet Nam, he supervised the storage and accounting of equipment and had authority over 19 soldiers.
 
 
 20
 Renfro first was employed by Navistar on February 28, 1966 as a squeezer/molder in the Foundry. He then joined the military and returned to Harvester in 1969, again as a squeezer/molder. He ultimately became a group leader in the Molding Department in March 1972. In July 1972, Renfro entered the MDT program. As an MDT, Renfro's assignment was to supervise 26 employees in cleaning up the Foundry every night after production.
 
 
 21
 After completing the MDT program in approximately ten months, Renfro was assigned to Department 84 as a molding foreman. He remained in that position throughout his career with Navistar. When new hunter automatic molding machines were installed in the department in 1979, Renfro was trained on the machines and given the responsibility for training other employees. Renfro received average or above average evaluations during his employment. When an individual named Ellsworth Henry was his supervisor, Renfro was rated as average on two occasions. This rating carried with it the recommendation that the employee receive no pay increase for that year. On both occasions, Renfro protested this rating and ultimately received a pay increase.
 
 
 22
 Renfro attended the August meeting of all supervisors in which he learned of the closing of the Foundry. He then met with Butschle and Poll a week or so later concerning his interest in transferring to a sister plant. Butschle and Poll allegedly mentioned the possibility of a transfer to Waukesha because the hunter automatic molding machines on which Renfro had been trained were being moved to Waukesha.
 
 
 23
 On August 17, 1980, Renfro had an interview with Norman Ruehl from the Waukesha facility. Ruehl allegedly told Renfro that there was a position available and that Ruehl was interested in Renfro because of his experience and background. Renfro then interviewed in Waukesha with Ruehl and Ralph Anderson on August 29, 1980. Ruehl explained the job requirements to Renfro. They also toured the city to look at possible homes for Renfro to buy. Renfro was told to expect a transfer on January 1, 1981.
 
 
 24
 Despite these interviews, Renfro was not employed at the Waukesha Foundry. The basis for this decision was that the hunter machines were not in fact moved to Waukesha as originally planned. Because Navistar lacked sufficient funds to move them, the hunter machines were not installed until 1984, when the Waukesha facility used current employees to operate them.
 
 
 25
 When Renfro called Ruehl on December 30, 1980, Ruehl told him that he could not be transferred to Waukesha. After speaking with Ruehl, Renfro called Poll, who said he thought Renfro already had been informed of the cancellation of the transfer. Poll told Renfro that his options were to go back into the bargaining unit or to take a managerial separation.
 
 
 26
 On two occasions, Renfro spoke with Ed Knight, Memphis plant side Personnel Director, a Black male, about the possibility of transferring to other Harvester locations or the Memphis Plant. Knight told Renfro that there were no positions available in the Memphis Plant.
 
 
 27
 On January 5, 1981, Renfro was demoted to the bargaining unit as a punchpress operator in Department 10. He was subsequently laid off on January 30, 1981, was recalled on March 16, 1981 as a checker/car loader, and was ultimately laid off permanently on May 1, 1981.
 
 
 28
 Renfro and Crawford sought at trial to compare themselves to several white management employees, all of whom performed their jobs satisfactorily or better. However, for purposes of appeal, Crawford and Renfro compare themselves only to Wayne Clift.
 
 
 29
 Wayne Clift was hired by Navistar on March 13, 1972 in the Molding Department. In October 1978, he became a foreman in the Melt Department, and in March 1979, he became a foreman in molding. He received extremely good evaluations and in fact was the highest rated management employee at his level. After the Foundry closing was announced, Memphis Foundry personnel gave him a very high recommendation for transfer to another facility. In February 1981, Clift was transferred laterally to the Louisville Foundry as a foreman in molding. He remained employed at that facility until he was laid off on October 1, 1982. He subsequently was recalled on May 2, 1983. His employment with Navistar "ended" on August 5, 1983.
 
 
 30
 In comparing Clift with Crawford, the district court judge stated that Crawford had been employed by Navistar almost seven years longer than Clift, and had been in management eight years longer than Clift. Much of Crawford's bargaining unit time had been in management experience and was in the Molding Department. Clift had bargaining unit experience in molding and about a year and a half's experience as a foreman in molding. Clift received extremely good evaluations. Crawford's evaluations were also good. Both men were qualified for the position to which Clift transferred at the Louisville facility. The district court found that Crawford's longer tenure and longer experience in management gave him the "edge" for the job in terms of objective qualifications.
 
 
 31
 Renfro had approximately six years more total service with Navistar and approximately six years more management experience than Clift had. Although Clift had been a foreman in molding for about a year and a half, Renfro had approximately seven years management experience as a molding foreman. Renfro claims that he clearly was more qualified for the position of foreman in molding to which Clift transferred in Louisville. Notably, Renfro did not receive an interview for the Louisville facility.
 
 
 32
 The district court also found that Crawford and Renfro had not met the burden of proving any of the charges made in the case and, accordingly, entered judgment for Navistar. Navistar claims, and the district court believed, that Navistar's objective was to transfer Memphis management employees to other locations to upgrade their workforce. To that end, it amended its severance pay policy to encompass those supervisors in other foundries in the event that they were removed to make room for a superior manager from the Memphis Foundry. The record indicates that John Hooks, the EEO manager for the Foundry, and a Black male, testified that several white management employees ultimately were terminated at the same time as were Crawford and Renfro. Navistar claims that it lacked a sufficient number of postitions at other facilities to place all managerial personnel who had been working at the Memphis Foundry, and that Crawford and Renfro's work experience did not qualify them to perform available jobs at other locations better than those who were already performing those jobs.
 
 
 33
 The district court made extremely detailed findings regarding the procedures Navistar followed in determining which employees to transfer and retain. Navistar notes that even though there was no interview list on which an employee could request a transfer, all supervisory personnel knew that such interviews were to be conducted, and Crawford never inquired into the procedure for obtaining an interview. Another plaintiff, who does not appeal, Murrell, was not one of the employees initially designated to be interviewed by Louisville or Waukesha. After learning of the interviews, he asked to be interviewed and in fact was interviewed, both in Memphis and in Louisville, where he was transported at Navistar's expense. Further, Roosevelt Strickland, a Black male, and Willie Taylor, also a Black male, were transferred to Waukesha and Louisville, respectively.
 
 
 34
 Although Crawford and Renfro claim on appeal to be raising only a disparate treatment claim, the trial judge analyzed the evidence under both disparate impact and disparate treatment theories of Title VII. As regards the disparate impact claim, the trial judge found that the statistics did not bear out the plaintiffs' contentions. She found that out of 59 similarly situated employees, 27 white employees were terminated and 18 were not, while 10 Blacks were terminated and three were not. She further found that the average length of time from January 1, 1981 to layoff or termination was 3.57 months for Blacks and 3.53 for whites. The court also found that, on the average, Blacks were transferred to hourly positions later than whites and, thus, Blacks remained as supervisors for a longer period of time than whites following the shutdown announcement. This statistical analysis was, in part, based on the expert testimony of Dr. Arnold Levine, professor of mathematics and statistics at Tulane University and Director of the Tulane Statistical Research Laboratory, who concluded that there was no statistically significant difference between the distribution of whites and Blacks from the pool of fifty-nine transferred into the available supervisory and hourly positions. Under all methods of analysis employed by Dr. Levine, there was no statistical evidence of differential treatment of Black and white employees.
 
 
 35
 The court examined 31 employment decisions. In only two of those decisions did the court note its disagreement with Navistar's evaluation of the compared employees' qualifications--Crawford's and Renfro's. The court stated that she would have assessed the qualifications differently in those instances, but that her view did not undermine the employer's articulation of a legitimate, non-discriminatory purpose, nor support Crawford and Renfro's claim that they carried their ultimate burden of proof with respect to those decisions.
 
 
 36
 In comparing Crawford and Renfro to other employees, the court found that both Crawford and Clift were well qualified for the position of foreman in the Louisville molding department. The court noted that, although Crawford's period of service as a managerial employee was longer than Clift's in terms of objective qualifications, the court also noted that the management in Louisville testified that Clift offered the greatest potential to upgrade the Louisville staff. The court found no disparate impact resulting from the good faith efforts of Navistar to place as many Memphis personnel into other jobs as possible.
 
 
 37
 The district court found that Crawford and Renfro had established a prima facie case of discrimination, but that Navistar had articulated a legitimate, non-discriminatory business reason for its decisions, and Crawford and Renfro did not prove that this explanation was pretextual. The record indicates that Renfro would have required some training before he could have performed at the required level in other foundries, whereas Clift did not. Thus, the district court dismissed all of the claims brought by all plaintiffs.
 
 II
 
 38
 On appeal, Crawford and Renfro argue that Navistar's alleged legitimate, non-discriminatory purpose was insufficient to rebut their prima facie case. In the alternative, they claim that they made a sufficient showing of pretext to defeat Navistar's explanations. Navistar claims that the district court's decision should be upheld because, as the district judge herself said, her assessment of the comparative qualifications of Crawford, Renfro and Clift, though different from Navistar's, does not require a finding that intentional discrimination has been committed. Crawford and Renfro appeal only the denial of their disparate treatment claim, apparently abandoning any disagreement with the district court's statistical analysis and its application to the disparate impact claim.
 
 
 39
 * The standard of review of Title VII discrimination cases is one of "clear error." "When reviewing the district court's factual findings in a Title VII discrimination case, we may not reverse unless we find that the district court committed clear error." Wrenn v. Gould, 808 F.2d 493, 499 (6th Cir.1987) (citing Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)). " 'If the district court's account of the evidence is plausible ... the court of appeals may not reverse it even though ... it would have weighed the evidence differently.' " Ibid. (quoting Anderson, 470 U.S. at 573).
 
 B
 
 40
 The trial court found that, although Crawford and Renfro could make out a prima facie case of race discrimination, Navistar had articulated a legitimate, non-discriminatory reason for its decisions; and Crawford and Renfro could not show that Navistar's determination was a pretext for intentional discrimination.
 
 
 41
 In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court announced four requirements to guide the federal courts in determining when and whether the employee has made out a prima facie case of discrimination under a disparate treatment theory. The employee must show that the employee: 1) is a member of a protected class; 2) applied and was qualified for the job; 3) was rejected; and 4) the position remained open and the employer continued to accept applications for the position. Id. at 802. If the employee satisfies this burden, the burden of proof shifts to the employer to show that his decision was motivated by a legitimate, nondiscriminatory purpose. Ibid. Finally, the employee has a final chance to prove discrimination by showing that the nondiscriminatory reason alleged by the employer is merely a pretext designed to disguise the discrimination. Id. at 804.
 
 
 42
 However, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citations omitted). The establishment of the prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee." Id. at 254.
 
 
 43
 To rebut the prima facie case, the employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Burdine, 450 U.S. at 255. The employer's profferred justification must be reasonably specific, but need not be based entirely on objective factors. Id. at 255, 258. If that burden is carried, the "presumption raised by the prima facie case is rebutted...." Ibid. However, it should be kept in mind that "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally," Burdine, 450 U.S. at 258 (citing McDonnell Douglas, 411 U.S. at 804); the employer's burden is only of production of evidence, not of persuasion. Id. at 257-58.
 
 
 44
 Once the employer has produced evidence of non-discriminatory purpose, the plaintiff must have a "fair opportunity to demonstrate that [the employer's] assigned reason ... was a pretext...." McDonnell Douglas, 411 U.S. at 807. Only if this final step is satisfied has the employee established that the employer's treatment was discriminatory.
 
 
 45
 In general, this analysis is to be applied in cases in which employees allege intentional race discrimination. The analysis was "never intended to be rigid, mechanical or ritualistic," nor does it "impose a duty to adopt hiring procedures that maximize[ ] the hiring of minority employees." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577-78 (1978). The employee, on the other hand, must show that the employer's "policy denied her specific employment opportunities that she otherwise would have obtained." Nashville Gas Co. v. Satty, 434 U.S. 136 (1977).
 
 
 46
 The district court found that Crawford and Renfro both made out prima facie claims of discrimination because they were more qualified, in an objective sense, than was Clift, the white employee hired to fill the Louisville position. Navistar does not challenge this finding, and there is nothing in the record to suggest that it is clearly erroneous. Thus, we proceed to the next step in the analysis.
 
 
 47
 The district court also found that Navistar had articulated a legitimate, non-discriminatory reason for choosing Clift rather than Crawford or Renfro: Clift was an exemplary employee, having received the highest ratings and production results in the Foundry. According to the admittedly subjective judgments of the decisionmakers in Louisville, Clift seemed the best choice with respect to the goal of upgrading the personnel in Louisville. Clift had the strongest recommendation from his superiors in Memphis, and had significant experience performing the identical task for which the Louisville management hired him. In that the employer's burden merely is to "set[ ] forth, through the introduction of admissible evidence, the reason for plaintiff's rejection," Burdine, 450 U.S. at 253, and that burden is one of only production and not persuasion, id. at 257-58, there is no basis for finding that the district court's finding was clearly erroneous.
 
 
 48
 Although Crawford and Renfro demonstrated that they were not even interviewed for the Louisville position despite the fact that they had expressed a desire to be transferred, they did not specifically request an interview. Further, the record supports the district court's finding that an interview was granted when another employee, Murrell, specifically requested an interview. In addition, the district court found, based in part on the expert testimony of Dr. Levine, that the statistical evidence disclosed no discriminatory motive or intent on Navistar's part in making the determination to transfer Clift rather than Crawford or Renfro. As the district court stated, even if the decision appears to have been excessively subjective, and even if the court would have made a different decision, that does not prove discriminatory intent. Thus, we conclude that there is no basis for finding clearly erroneous the district court's determination that Navistar met its burden of establishing that it was motivated by a legitimate, non-discriminatory purpose.
 
 
 49
 Crawford and Renfro's final argument on appeal is that Navistar's seemingly legitimate reason for its decisions was, in fact, a pretext for discrimination. The district court found no evidence to support this claim, and the record does not indicate that this finding was clearly erroneous. Although proof of pretext may be established "by showing that the defendant's justifications are untrue and therefore must be a pretext," Tye v. Board of Education of the Polaris Joint Vocational School District, 811 F.2d 315, 320 (6th Cir.1987), there is no basis for believing that Navistar's justifications--the recommendations of the Memphis supervisors and Clift's performance history and experience--are in any sense untrue. Nor is there evidence that Navistar was not of the genuine (albeit subjective) belief that Clift was a better addition to the Louisville staff than were Crawford and Renfro because of Clift's excellent past performance.
 
 
 50
 Crawford and Renfro argue that they both were more qualified than Clift, and that this indicates that Navistar's justifications were false. However, the district judge herself stated that her disagreement regarding the three men's objective qualifications did not prevent Navistar from reaching a different subjective decision, nor did it show that this decision was motivated by discrimination. There is nothing in the record or in the case law to indicate that this result is clearly erroneous. Reaching an employment decision different from that of the district court, if done in non-discriminatory good faith, is not evidence of discrimination.
 
 III
 
 51
 The district court's fifty-eight page findings in this case are extremely thorough and are supported by the record; there is no basis for overturning those findings. Accordingly, the district court's decision in this case is AFFIRMED.
 
 
 
 *
 The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation